# In the United States Court of Federal Claims

No. 17-1392

Filed: July 1, 2020

|  |  |  |
|---|---|---|
| ALVIN S. DeJONG, Trustee of the Alvin S. DeJong Exempt Trust, | ) ) ) ) | Fifth Amendment Takings Claim; RCFC 12(b)(1); Motion to Dismiss; RCFC 56; Motion for Summary Judgment; Tucker Act; 28 U.S.C. § 1491; Stabilization Doctrine; Statute of Limitations; 28 U.S.C. § 2501; Time-Barred. |
| Plaintiff, | ) ) |  |
| v. | ) ) |  |
| THE UNITED STATES, | ) ) |  |
| Defendant. | ) ) ) |  |

*Chris Alan Montgomery*, Montgomery Law Firm, Colville, WA, for plaintiff.

*Brian R. Herman*, U.S. Department of Justice, Environment and Natural Resources Division, Washington, DC, for defendant.

### OPINION AND ORDER

*SMITH*, **Senior Judge**

      This matter is before the Court on defendant's Motion to Dismiss or for Summary Judgment. Plaintiff, Alvin S. DeJong, Trustee of the Alvin S. DeJong Exempt Trust ("Trust"), alleges a Fifth Amendment Taking of the Trust's real property in Kettle Falls, Washington, that was "damaged" by the United States Department of the Interior, Bureau of Reclamation ("Bureau"), and the United States Army Corps of Engineers ("Corps"). *See* Complaint for Inverse Condemnation (hereinafter "Compl.") at 1–2, 6. Plaintiff seeks $1,300,000 in damages, attorneys' fees and costs, and "[s]uch other and further relief as this court may deem proper." *Id.* at 10. After the close of discovery, defendant filed a Motion to Dismiss pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") or for Summary Judgment pursuant to RCFC 56. *See generally* Defendant's Motion to Dismiss Pursuant to RCFC 12(b)(1) or for Summary Judgment Pursuant to RCFC 56 (hereinafter "Def.'s Mot."). In that Motion, defendant principally argues that plaintiff's claims are time-barred and must be dismissed for lack of subject-matter jurisdiction. *See id.* at 1. In the alternative, defendant alleges that plaintiff "has failed to identify any government action that could constitute a taking, and has in any event failed to demonstrate causation or appropriation." *Id.* at 1–2, 21. For the reasons set forth below, defendant's Motion is granted-in-part and denied-in-part as moot.

**I.      Background**

A brief depiction of the history and neighboring landscape best lay out the foundation of this case. Between 1933 and 1941, the Grand Coulee Dam ("Dam") was built in Washington State on the Columbia River. Def.'s Mot. at 1, 3 (citing *About Grand Coulee Dam*, Bureau of Reclamation, https://www.usbr.gov/pn/grandcoulee/about/index.html (last updated May 8, 2020) (hereinafter "*About Grand Coulee Dam*")). The construction of the Dam formed the Franklin D. Roosevelt Lake ("Lake Roosevelt"), which sits behind the Dam and spans just over 150 miles upstream to the Canadian border. *Id.* at 1, 3 (citing *Grand Coulee Dam*, Bureau of Reclamation, https://www.usbr.gov/projects/index.php?id=155 (last visited Oct. 29, 2019); and citing Def.'s Ex. A). Since its construction, the Dam has provided flood control, water for irrigation, and power to the Pacific Northwest through hydroelectric generation. *Id.* at 1, 3 (citing *About Grand Coulee Dam*).

The "maximum surface elevation" of Lake Roosevelt is 1,290 feet above sea level, which is referred to as "full pool." Def.'s Mot., Attach. 1 (Declaration of John Roache) (hereinafter "Roache Decl.") at 1. The "minimum surface elevation," or "the bottom of active capacity," is 1,208 feet above sea level. *Id.* Due to runoff, dam releases, and "many other factors," the water level of Lake Roosevelt fluctuates throughout the year in seasonal patterns, typically lowering between January and April and refilling from May to early July. *Id.* at 2; *see also* Def.'s Mot. at 3 (citing Roache Decl. at 2). During the months of July and August, the Bureau again draws down the water levels, and, by the end of September, "attempts to fill the reservoir to a minimum surface elevation of 1,283 feet above sea level," which it maintains through the end of October. Roache Decl. at 2–3. The Bureau may then draw down the water levels to 1,275 and 1,270 feet above sea level by the end of November and December, respectively. *Id.* Throughout the year, "[r]eservoir draw down at Lake Roosevelt is generally limited to a standard draft rate limit of 1.5 feet per 24-hour period," though "a draft rate exceedance [may be] requested in certain circumstances." *Id.*

Roughly 100 miles upstream of Grand Coulee Dam is Roper Bay, "an inlet [off] the main body of Lake Roosevelt." Def.'s Mot. at 1; Def.'s Ex. B; *see also* Compl. at 3. Slightly north of Roper Bay is Roper Creek, a non-navigable tributary that flows into the Bay. *See* Def.'s Mot. at 1, 4; Def.'s Ex. B; *see also* Compl. at 7. Given their interconnectivity, both Roper Creek and Roper Bay are subject to seasonal increases and decreases in their water levels akin to those in Lake Roosevelt. *See* Pl.'s Compl. at 3; *see also* Def.'s Mot. at 1, 3.

In 2001, Alvin S. DeJong and his wife, Rogene DeJong, purchased a parcel of land in Ferry County, Washington, from Gayle and Jerry McKellar—the property now at issue in this case—that is upslope of "the confluence of Roper Creek and Roper Bay" ("DeJong Property").[1] Compl. at 2–3; Def.'s Mot. at 4 & n.1, 5 (citing Def.'s Ex. E). That parcel consists of 31.43 acres of real property located approximately ninety-eight river miles upstream of the Grand Coulee Dam. Compl. at 3; Def.'s Mot. at 4 (citing Def.'s Ex. C). The Federal Government owns

---

[1] On June 14, 2007, through a Statutory Warrant Deed, the DeJongs transferred their interest in the property to Alvin S. DeJong, Trustee of the Alvin S. DeJong Exempt Trust, which was recorded on June 22, 2007. Complaint for Inverse Condemnation at 2, Ex. A.

the land that surrounds Roper Creek and Roper Bay, including the land "from the water's edge upslope to the DeJong property line." *See* Def.'s Mot. at 4.

The property line where the DeJong Property abuts the land owned by the Federal Government is "near to but generally higher than" the 1,310-foot elevation line ("1310' elevation line") established at the time the Grand Coulee Dam was constructed. *Id.* (citing Def.'s Ex. B at 1–2); *see also* Compl. at 3. As the "land terraces around present-day Roper Creek and Roper Bay were formed by glacial deposition during the last ice age," both the DeJong Property and the federal property below it "are comprised of glacial lake deposits of silt, overlain with glacial river outwash," or sand. Def.'s Mot. at 11 (citing Def.'s Ex. S at 9). Given that composition, "Roper Creek has been eroding through these deposits since that time." *See id.* Additionally, plaintiff claims that when the water levels of Lake Roosevelt and Roper Bay are high, the water "serves as lateral support for the DeJONG property; when the water levels are low, there is a lack of lateral support for the DeJONG property." Compl. at 3.

The purchase price for the DeJong Property was $175,000. Def.'s Mot. at 5 (citing Def.'s Ex. E). Though the McKellars believed the parcel "was a very valuable property because of the location," they wanted the price to reflect certain land slippage that occurred prior to and during their ownership. *Id.* (quoting Def.'s Ex. F (Deposition of Gayle McKellar) (hereinafter "Gayle McKellar Dep.") at 24:1–15; then citing Def.'s Ex. G (Deposition of Jerry McKellar) at 23:16–22); *see also* Def.'s Ex. S at 12. The occurrence of that land slippage is documented in a disclosure form that the McKellars provided to the DeJongs prior to closing. *Id.* (citing Def.'s Ex. D (Deposition of Alvin DeJong) (hereinafter "Alvin DeJong Dep.") at 15:18–16:5; then citing Def.'s Ex. J (Deposition of Rogene DeJong) (hereinafter "Rogene DeJong Dep.") at 14:22–15:11; and then citing Def.'s Ex. K). Section 4(D) of that disclosure form addressed whether the McKellars had knowledge of "any settling, slippage, or sliding of either the house or other structures/improvements located on the property," to which the McKellars marked "yes" and wrote "parking area slippage." Def.'s Ex. K at 4. In section 4(E), the McKellars indicated that "prior slippage" had occurred on the "Driveways." *Id.* In section 7, the McKellars noted that "prior to 1999," the property had experienced "settling, soil, standing water, or drainage problems." *Id.* at 5. Lastly, the Real Estate Purchase and Sale Agreement executed between the DeJongs and the McKellars included several provisions that provided the DeJongs with a ten-day "inspection/investigation period." Def.'s Ex. E at 1–3. Nevertheless, the DeJongs declined to obtain an inspection of the property. Def.'s Mot. at 5 (citing Rogene DeJong Dep. at 15:12–14).

In 2001, at the time of purchase, the DeJong Property included an A-frame cabin, a log cabin, water systems for each of those structures, and a driveway leading into the property. *See* Compl. at 3; Def.'s Mot. at 6 (citing Gayle McKellar Dep. at 18:3–19:20; and then citing Alvin DeJong Dep. at 14:9–12); *see also* Def.'s Ex. K. In 2007, several years after they purchased the property, the DeJongs decided to build a 5,000 square-foot retirement home. Compl. at 3; Def.'s Mot. at 7. Prior to commencing construction, Mr. DeJong contacted Mrs. McKellar to ask if she thought "there would be another slide, because they were considering building another home on the property." Def.'s Mot. at 7; Gayle McKellar Dep. at 46:14–20.[2] In response, Mrs. McKellar

---

[2] Though Mr. DeJong does not recall this particular phone call, he does not dispute that it occurred. Def.'s Ex. D (Deposition of Alvin DeJong) at 24:9–24.

told him that she "had no idea or no way to know that" and "strongly urged him to get [the advice of] some professional, . . . an engineer or geologist[,] that would be able to give them better information." Gayle McKellar Dep. at 46:21–25. The DeJongs again declined to hire a specialist to inspect or assess the property. Def.'s Mot. at 7 (citing Alvin DeJong Dep. at 23:3–25; and then citing Def.'s Ex. P (Deposition of Howard Michael Mattingly) (hereinafter "Mattingly Dep.") at 12:17–22, 20:6–21:13, 23:8–24:2).

Shortly thereafter, the DeJongs proceeded with construction on the property without anyone—including Mr. Mattingly, their contractor—conducting a soil test on the piece of land that they had selected to build the DeJongs' future home. Def.'s Mot. at 7 (citing Alvin DeJong Dep. at 23:3–25; and then citing Mattingly Dep. at 12:17–22, 20:6–21:13, 23:8–24:2, 25:2–16). Instead, the DeJongs and Mr. Mattingly selected "a relatively flatter portion of the property upslope from the existing log and A-frame cabins," adjacent to the 1310' elevation line, to build the DeJongs' home, an area which they knew had a top layer of sand. *Id.* (citing Alvin DeJong Dep. at 21:20–22:13, 23:6–22; then citing Rogene DeJong Dep. at 21:4–16; and then citing Mattingly Dep. at 25:2–16); *see also* Compl. at 3. Construction on the home ended in 2009, and the completed residences and realty are appraised at $1,300,000. Compl. at 3. Light Detection and Ranging ("LiDAR") imagery of the area obtained for purposes of this litigation "reveals 'numerous historic landslides' surrounding Roper Creek." Def.'s Mot. at 12 (quoting Def.'s Ex. S at 11; and then citing Def.'s Ex. S at 38). The imagery further identifies that the DeJongs' home is "located within one of these historic landslide masses," and that the DeJongs' A-Frame and log cabins are built at the confluence of that same historic mass and a "smaller historic landslide mass." *Id.*

In 2013, after experiencing a "significant amount of snowfall at the property," the second septic system on the DeJong Property "dropped down . . . at the most, five inches at one place," which Mr. DeJong described as "a crack, [or] a scarp"[3]; the septic tank, however, "continued to function." Alvin DeJong Dep. at 31:17–24; Def.'s Mot. at 9–10 (citing Rogene DeJong Dep. at 28:11–14, 37:1–25; then citing Def.'s Ex. U; and then citing Alvin DeJong Dep. at 32:12–16). Due to this incident, the DeJongs hired F.C. Budinger, a geotechnical engineer, who visually inspected their property on July 5, 2013. Def.'s Mot. at 10 (citing Alvin DeJong Dep. at 32:6–8; then citing Def.'s Ex. W). In a report dated July 22, 2013, Mr. Budinger noted that the "property is located on a slope directly above the northeast side of Roper Bay . . . on the east side of Lake Roosevelt," and that the nearby and onsite "earth materials" are "comprise[d] [of] fine sands with some silt." Plaintiff's Response and Opposition to Defendant's Motion to Dismiss Pursuant to RCFC 12(b)(1) or for Summary Judgment Pursuant to RCFC 56 (hereinafter "Pl.'s Resp."), Ex. B at 1. He further determined that "[i]n the area below the house, several head scarps were noted," and that "any additional weight on the slope or at its crest reduces stability while any surcharge at its toe increases stability." *Id.* at 2. Thus, he concluded, "the noted distress is due to erosion at the shoreline exacerbated by repeated rapid drawdowns," and that "[i]f nothing is done to improve stability, repeated failures could endanger all of the buildings." *Id.* at 3.

---

[3] Scarp is defined as "a line of cliffs produced by faulting or erosion." *Scarp*, Merriam-Webster.com, http://merriam-webster.com/dictionary/scarp (last visited July 1, 2020).

Shortly thereafter, the DeJongs asked the Bureau to inspect the DeJong Property. Def.'s Mot. at 10 (citing Alvin DeJong Dep. at 47:1–9). Accordingly, on August 28, 2013, Lon Ottosen, a natural resource specialist with the Bureau, and Michael Bjorklund, a geologist with the Bureau, visited the DeJong Property. *Id.* (citing Def.'s Ex. X at 1). After their visit, Mark Jansen, the power manager at the Bureau's Grand Coulee Power Office, wrote a letter to the DeJongs in which he stated the following:

> Following a site visit on August 28, 2013 and subsequent research of aerial imagery and digital elevation data, our staff has determined there are several factors that are likely contributing to slope stability issues at your property. Indications of these issues are in the form of localized cracking or scarps that have recently developed, as well as some settling that has occurred over time. . . . Our staff has concluded that the effects of reservoir influenced erosion and slippage is limited to Federal property. It is not our policy, nor is it economically feasible, to construct stabilization structures to protect federally owned shoreline. Additionally, given the influence that ground water movement has on a portion of the slope adjacent to the Reservoir, we do not believe that a protection structure will add any significant stability to the shoreline near your property.

Def.'s Ex. X at 1.

Over the subsequent three years, the DeJongs "did not experience any sliding or subsidence." Def.'s Mot. at 10 (citing Alvin DeJong Dep. at 32:19–22; and then citing Rogene DeJong Dep. at 44:13–19). However, in 2017, after another "significant snowfall," the DeJongs once again had issues on their property. *Id.* (citing Rogene DeJong Dep. at 28:11–14; and then citing Def.'s Ex. Y). Specifically, in "February or March 2017, a pipe broke under the log cabin," and in "March or April 2017," the DeJongs' children identified "land slippage in the area of the new house," including a crack in the deck, damage to the new home's septic system, and a lack of water and electrical service. *Id.* at 11 (citing Alvin DeJong Dep. at 33:8–11, 33:25–34:8, 35:21–24, 43:11–13, 43:23–44:1; and then citing Rogene DeJong Dep. at 44:13–46:22). Additionally, the DeJongs' children noted that "wires were ripping out of the electrical panel in the garage and that the electric meter had suffered damage from land movement." *Id.* (citing Alvin DeJong Dep. at 37:4–23, 38:1–13). Since that time, the DeJongs have not lived in their home and instead reside in a travel-trailer on the property for four to five months each year. *Id.* (citing same at 8:10–21, 43:23–44:1, 53:22–55:3).

On September 29, 2017, plaintiff filed its Complaint with this Court. *See generally* Compl. Defendant filed its Answer on December 27, 2017. *See generally* Defendant's Answer. Consistent with the Court's Scheduling Orders, fact discovery closed on December 31, 2018, and expert discovery closed on October 31, 2019. *See generally* March 8, 2018 Order; August 20, 2018 Order. On December 20, 2019, defendant filed its Motion to Dismiss or for Summary Judgment. *See generally* Def.'s Mot. On January 31, 2020, plaintiff filed its Response to defendant's Motion to Dismiss. *See generally* Pl.'s Resp. Defendant filed its Reply on February 28, 2020. *See generally* Defendant's Reply in Support of Its Motion to Dismiss or for Summary Judgment (hereinafter "Def.'s Reply"). The Court held oral argument on April 22, 2020. Defendant's Motion to Dismiss or for Summary Judgment is fully briefed and ripe for review.

## II.     Standard of Review

This Court's jurisdictional grant is found primarily in the Tucker Act, which gives this Court the power "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, . . . or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (2018).  Though the Tucker Act expressly waives the sovereign immunity of the United States against such claims, it is "merely a jurisdictional statute and does not create a substantive cause of action" enforceable against the United States for money damages.  *Rick's Mushroom Serv. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (citing *United States v. Testan*, 424 U.S. 392, 398 (1976)); *Quimba Software, Inc. v. United States*, 132 Fed. Cl. 676, 680 (2017) (citing same).  Instead, "a plaintiff must identify a separate source of substantive law that creates the right to money damages," such as a money-mandating constitutional provision.  *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (citing *United States v. Mitchell*, 463 U.S. 206, 216 (1983)); *Loveladies Harbor. Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).  "One such money-mandating constitutional provision is the Takings Clause of the Fifth Amendment," which provides, "nor shall private property be taken for public use, without just compensation."  U.S. Const. amend. V; *Fairholme Funds, Inc. v. United States*, No. 13-465, 2016 U.S. Claims LEXIS 2294, at *4 (Fed. Cl. Sept. 30, 2016).

Jurisdiction is a threshold issue that "must be resolved before the Court can take action on the merits."  *Remote Diagnostic Techs. LLC v. United States*, 133 Fed. Cl. 198, 202 (2017) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)).  When a "motion to dismiss 'challenges the truth of the jurisdictional facts,'" this Court "'may consider relevant evidence in order to resolve the factual dispute'" and may make factual findings that are decisive of the jurisdictional issue.  *Freeman v. United States*, 875 F.3d 623, 627 (Fed. Cir. 2017) (quoting *Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir. 2014)); *Hedman v. United States*, 15 Cl. Ct. 304, 306 (1988).  When considering a motion to dismiss for lack of subject-matter jurisdiction, the Court will treat factual allegations in the complaint as true and will construe those allegations in the light most favorable to the plaintiff.  *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014); *Oakland Steel Corp. v. United States*, 33 Fed. Cl. 611, 613 (1995) (citing *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988)).  However, the plaintiff must still establish that this Court has jurisdiction over its claims by a preponderance of the evidence.  *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(c); *see also, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A "genuine" dispute is one that "may reasonably be resolved in favor of either party," and a fact is "material" if it might significantly alter the outcome of the case under the governing law.  *Anderson*, 477 U.S. at 248, 250.  In determining the propriety of summary judgment, a court will not make credibility determinations and will draw all inferences in favor of the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *see also, e.g.*, *Sys.*

*Planning Corp. v. United States*, 107 Fed. Cl. 710, 716 (2012).

### III. Discussion

When alleging a Fifth Amendment Takings claim, a plaintiff "must demonstrate that they have a property interest to assert and that the government physically or by regulation infringed on that interest for public use." *Craig Patty & Craig Thomas Expeditors, LLC v. United States*, 136 Fed. Cl. 211, 214 (2018). However, as in all cases before this Court, 28 U.S.C. § 2501 (2018) imposes upon plaintiffs a six-year statute of limitations. *W. Shoshone Nat'l Council v. United States*, 73 Fed. Cl. 59, 64 (2006); *see also John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1354 (Fed. Cir. 2006), *aff'd*, 552 U.S. 130 (2008). The statute of limitations is "an express limitation on the [Tucker Act's] waiver of sovereign immunity," and, "[d]ue to the jurisdictional nature of section 2501[,] it may not be waived." *John R. Sand & Gravel Co.*, 457 F.3d at 1354–55 (citing *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988)); *Hart v. United States*, 910 F.2d 815, 817 (Fed. Cir. 1990); *see also* 28 U.S.C. § 2501. Thus, a claim over which this Court has jurisdiction is "barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501.

As "[a] claimant under the Fifth Amendment must show that the United States, by some specific action, took a private property interest for a public use without just compensation," a takings claim "accrues when that taking action occurs." *Alliance of Descendants of Tex. Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed. Cir. 1994) (citing *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 294 (1981); and then citing *Steel Improvement & Forge Co. v. United States*, 355 F.2d 627, 631 (Ct. Cl. 1966)); *Barlow & Haun, Inc. v. United States*, 118 Fed. Cl. 597, 614 (2014), *aff'd*, No. 015-5028, 2015 U.S. App. LEXIS 17645 (Fed. Cir. Oct. 9, 2015). The Federal Circuit has held that "a cause of action against the government has 'first accrued' only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians*, 855 F.2d at 1577 (emphasis in original) (citing *Kinsey v. United States*, 852 F.2d 556, slip op. at 3 n.\* (Fed. Cir. 1988) ("[A] claim does not accrue unless the claimant knew or should have known that the claim existed")).

The stabilization doctrine originates in *United States v. Dickinson*, 331 U.S. 745 (1947), and has since been construed as a doctrine that "recognizes that determining the exact point of claim accrual is difficult when the property is taken by a gradual physical process rather than a discrete action undertaken by the Government such as a condemnation or regulation." *Mildenberger v. United States*, 643 F.3d 938, 945 (Fed. Cir. 2011) (citing, *e.g.*, *Navajo Nation v. United States*, 631 F.3d 1268, 1273–74 (Fed. Cir. 2011)). The Supreme Court has made clear, however, that the stabilization doctrine must be narrowly construed, explaining in *United States v. Dow*, 357 U.S. 17, 27 (1958), that "[t]he expressly limited holding in *Dickinson* was that the statute of limitations did not bar an action under the Tucker Act for a taking by flooding when it was uncertain at what stage in the flooding operation the land had become appropriated to public use." *See also Etchegoinberry v. United States*, 114 Fed. Cl. 437, 476 (2013) ("In *United States v. Dow*, the Supreme Court [held] that the stabilization doctrine applies only in a narrow set of circumstances." (citations omitted)). In *Kabua v. United States*, 212 Ct. Cl. 160, 165 (1976), the Court of Claims elaborated on that interpretation, stating that the Supreme Court's decision in

*Dow* is "more or less limited to the class of flooding cases to which it belonged, when the landowner must wait in asserting his claim, until he knows whether the subjection to flooding is so substantial and frequent as to constitute a taking."

In its Motion, defendant's chief argument is that plaintiff's Complaint is "decades too late," as plaintiff is challenging "the design and construction of [the] Grand Coulee Dam," which was completed in 1941. Def.'s Mot. at 15–16. Defendant further claims that "even if DeJong's challenge is to the operation of the dam, rather than its construction, those operations have been occurring consistently for decades, and DeJong knew about landslides at the property more than six years prior to the filing of the complaint." *Id.* at 16. Additionally, defendant argues that "the federal government did not cause instability and slippage at the DeJong property" as plaintiff asserts and that, regardless, any such cause of action accrued more than six years prior to plaintiff's filing of its Complaint. *Id.* As such, defendant contends that plaintiff's Complaint is time-barred and should therefore be dismissed. *Id.*

In response, plaintiff asserts that "the gravamen" of its "inverse condemnation claim stems from the operation of the Grand Coulee Dam over many years, not its mere construction, which was completed in 1941." Pl.'s Resp. at 12. Plaintiff further contends that, consistent with the stabilization doctrine, "the earliest that the government's actions can be said to have seriously interfered" with the DeJong Property is when Mr. DeJong "first noticed the physical changes on the property and received the report from his expert, Mr. Budinger." *See id.* at 13–14. Thus, plaintiff argues, its "cause of action for a taking by a continuing process of physical events d[id] not arise until the situation bec[ame] stabilized," which, according to plaintiff's intereprelation of the stabilization doctrine, could not have occurred before 2012 or 2013. *Id.* at 14–15, 17 (citing *St. Bernard Par. v. United States,* 88 Fed. Cl. 528 (2009); and then citing *Bagwell v. United States,* 21 Cl. Ct. 722 (1990)). In support of its argument, plaintiff maintains that, even if the DeJongs "may have had some indication that the property had experienced some land subsidence" more than six years prior to plaintiff's filing of its Complaint, the cause of that subsidence "was as yet unknown." *Id.* at 17. Moreover, plaintiff argues that Mr. McKellar's belief that a landslide occurred on the property in the 1990s "cannot reasonably be attributed to" the DeJongs. *Id.* Accordingly, plaintiff contends that it had "until the Spring of 2018 in which to bring an action," and that its Complaint was therefore timely. *Id.*

In its Reply, defendant reiterates its argument that plaintiff's Complaint is time-barred, as the Dam "was completed nearly eight decades ago." Def.'s Reply at 2. Defendant further claims that the Dam "has operated consistently since that time," and that plaintiff "misunderstands claim accrual principles," as plaintiff knew about its cause of action more than six years before filing its Complaint. *See id.* at 2–4. In support of that argument, defendant contends that "the statute of limitations begins to run when a plaintiff should have been aware of the existence of his cause of action," which, according to defendant, was in 2001, when the DeJongs purchased the property, and which "certainly [was] no later than 2008–09, when [the DeJongs] built [their] new home." *Id.* at 4 (citing *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995)). Defendant further asserts that the DeJongs knew about the land slippage before they closed on the property, as "the McKellars disclosed the past incident of subsidence at the property in at least five different locations on the disclosure form, using language such as subsidence, slippage, or landslides." *Id.* at 4–5 (citing Def.'s Ex. K). Defendant claims that the DeJongs were again

8

notified of potential issues with the property in 2008 or 2009, when Mrs. McKellar advised the DeJongs to obtain a professional to inspect the property prior to construction, a "fact [that] is undisputed." Def.'s Reply at 5 (citing Gayle McKellar Dep. at 46:14–25). Thus, defendant argues, plaintiff's position that its claim "could not have accrued prior to 2012 or 2013" fails, as the standard for claim accrual is when a plaintiff "knew or *should have known* of his cause of action." *Id.* at 6 (emphasis in original); *see also* Def.'s Mot. at 19 (citing *Fallini*, 56 F.3d at 1380). Finally, defendant contends that plaintiff's "attempt to rely on the stabilization doctrine does not change this conclusion," as the "stabilization doctrine is inapplicable here," and therefore plaintiff's Complaint is untimely. *See* Def.'s Reply at 5–8 (citing *Dow*, 357 U.S. at 27).

The bases of plaintiff's Complaint appear to be two-fold. First, the Court determines that plaintiff's preliminary allegation is that a taking occurred "when the Grand Coulee Dam was constructed and Lake Roosevelt was created." *See* Compl. at 6. The Court concludes that plaintiff's allegations are secondarily founded on the "the consequential effects of the [Corps'] activities of raising and lowering the river and tributary to further navigation, flood control, irrigation and electrical power generation, undertaken solely within the 1310' elevation boundaries of the Columbia River, Roper Bay Inlet, and Roper Creek beds." *See id.* at 7. The Court finds plaintiff's Complaint untimely under both theories.

Plaintiff's argument that the taking occurred as a result of the construction of the Dam plainly falls outside the statute of limitations for filing a claim with this Court, *see* 28 U.S.C. § 2501, as plaintiff filed its Complaint in 2017, seventy-six years after the Dam was built in 1941, which far surpasses the six-year statute of limitations at this Court. Thus, any allegation that the taking occurred in 1941 is time-barred pursuant to 28 U.S.C. § 2501.

Plaintiff's alternative theory based on the raising and lowering of the water levels in the bodies of water adjacent to the DeJong Property similarly fails. As an initial matter, plaintiff effectively concedes that the Dam has been consistently operated since its construction in 1941. *See* Compl. at 7–8. Thus, the timeliness of any claim arising out of the operation of the Dam is necessarily limited by the date upon which construction of the Dam concluded and operations that raised and lowered the water levels began to noticeably affect adjoining parcels of land, such that the landowner "was or should have been aware of" a resulting cause of action. *See Hopland Band of Pomo Indians*, 855 F.2d at 1577. At the earliest, noticeable effects giving rise to a cause of action occurred in the 1990s, when the first slippage on the what is now the DeJong Property occurred. At the latest, the DeJongs were provided with such notice in 2001 when they received the disclosure form from the McKellars prior to closing, which noted land slippage on the property as early as 1999, and which noted additional slippage under the McKellars' ownership, including "parking area slippage" and "prior slippage" on the "Driveways." *See* Def.'s Ex. K at 5. Moreover, the Court concludes that the ten-day "inspection/investigation period" provisions in the Real Estate Purchase and Sale Agreement, together with the provisions in the disclosure form, suggest that, at the very least, the DeJongs "should have been aware of" issues on the property that gave rise to a potential claim at the time the DeJongs purchased the property in 2001. *See Hopland Band of Pomo Indians*, 855 F.2d at 1577; *see also* Def.'s Ex. E at 1–3; Def.'s Ex. K at 4–5. Thus, for plaintiff's Complaint to be timely in accordance with 28 U.S.C. § 2501, plaintiff had to file its Complaint no later than 2007, six years after the DeJongs purchased

the property.  Instead, the DeJongs waited approximately sixteen years to file a Complaint with this Court, ten years beyond this Court's six-year statute of limitations.

Finally, even if the Court was to consider the timeliness of plaintiff's Complaint in accordance with the stabilization doctrine, which the Court deems inapplicable to the case at bar, plaintiff's Complaint would still be untimely.  Both the Supreme Court and the Court of Claims have narrowly construed the applicability of the stabilization doctrine, "more or less limit[ing] [it] to the class of flooding cases to which it belonged."  *Kabua*, 212 Ct. Cl. at 16; *see Dow*, 357 U.S. at 27; *see also Etchegoinberry*, 114 Fed. Cl. 437 at 476.  Given that binding precedent and the facts in the instant case, the Court concludes that the stabilization doctrine does not apply, as plaintiff's claims do not fall within the class of flooding cases upon which the stabilization doctrine was designed to apply.  Moreover, even if the stabilization doctrine did apply, plaintiff's claims sufficiently "stabilized" as of 2001, when the DeJongs were put on notice of repeated and obvious incidents of prior slippage when closing on the property.  For those reasons, plaintiff's Complaint is time-barred pursuant to 28 U.S.C. § 2501.  As plaintiff's claims are time-barred, the Court need not reach the parties' arguments on summary judgment.  Accordingly, defendant's Motion for Summary Judgment is denied as moot.

## IV.      Conclusion

For the reasons set forth above, defendant's MOTION to Dismiss or for Summary Judgment is hereby **GRANTED-IN-PART** as to the motion to dismiss, and **DENIED-IN-PART as moot** as to the motion for summary judgment.  Accordingly, plaintiff's claims are hereby **DISMISSED** for lack of subject-matter jurisdiction, as plaintiff's claims are time-barred pursuant to 28 U.S.C. § 2501.  The Clerk is directed to enter judgment in favor of defendant, consistent with this Opinion and Order.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge